Michelle De Blasi (#022151)
LAW OFFICE OF MICHELLE DE BLASI PLLC
7702 East Doubletree Ranch Road, Suite 300
Scottsdale, Arizona 85258
(602) 510-4469
mdeblasi@mdb-law.com

Paul K. Stockman (application for admission *pro hac vice* forthcoming)
KAZMAREK MOWREY CLOUD LASETER LLP
One PPG Place, Suite 3100
Pittsburgh, Pennsylvania 15222
(404) 333-0752
pstockman@kmcllaw.com

*Attorneys for Plaintiff EnPro Holdings, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| EnPro Holdings, Inc., a North Carolina corporation,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>United States of America,<br><br>　　　　　Defendant. | Case No. CV-21- _____-PCT-_____<br><br>**COMPLAINT** |

Plaintiff EnPro Holdings, Inc. ("EnPro"), for its complaint against the United States of America, alleges the following:

### NATURE OF THE ACTION

1.　　Through this action, EnPro seeks contribution or cost recovery from the United States under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.,* for necessary environmental response costs EnPro has incurred as a result of releases or threatened releases of hazardous substances at eight former surface mining uranium facilities located on the Navajo Nation, near Cameron, Coconino County, Arizona (the "Sites"). The United States is liable to EnPro under CERCLA because the United States (acting through various departments, agencies and instrumentalities) at all times owned the Sites,

operated the Sites, and arranged for the disposal or treatment of hazardous substances at the Sites.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction under 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331.

3.    Venue in this Court is proper pursuant to 28 U.S.C. § 9613(b), because Defendant may be found in this district and because the releases or threatened releases of hazardous substances took place within this district.

## PARTIES

4.    EnPro is a corporation organized under the laws of North Carolina with its principal place of business in Charlotte, North Carolina.  EnPro is successor to A&B Mining Corporation ("A&B").

5.    Defendant United States of America, acting through various departments, agencies and instrumentalities, owned and operated the Sites and arranged for the disposal or treatment of hazardous substances at the Sites.  Certain of these departments, agencies and instrumentalities include, without limitation, the Department of the Interior (acting in part through the Bureau of Indian Affairs (the "BIA"), the United States Geological Survey (the "USGS") and the Office of Surface Mining Reclamation and Enforcement) and the Department of Energy (as successor to the Atomic Energy Commission (the "AEC")).  The United States has waived sovereign immunity under 42 U.S.C. § 9620(a)(1) with respect to the claims asserted herein.

## FACTUAL BACKGROUND

6.    The start of the Cold War arms race precipitated the need for immediate and large-scale supplies of uranium.  The only significant domestic source of uranium ore was carnotite deposits on the Colorado Plateau, an approximately 130,000 square mile area centered on the "Four Corners" region.

7.    The United States took a variety of measures to develop uranium reserves on the Colorado Plateau.  The United States established a Domestic Uranium

- 2 -

Procurement Program (setting guaranteed prices and quality standards), established ore buying stations, and financed the construction of uranium mills.  The United States also pursued a broad exploratory program: it operated field camps and employed nearly 500 engineers, geologists and other professionals, and conducted an extensive program of exploratory drilling, airborne reconnaissance, and field exploration.  The United States further offered technical assistance, and funded an extensive program of road building to enable ore to be transported to buying stations operated by the United States.

8.     Starting in 1949, the United States realized that the Navajo Reservation might be a valuable source of uranium, and undertook an extensive program of prospecting and drilling.  Uranium deposits were first reported in the Cameron area, on the Reservation's western edge, in 1950.  Once the AEC confirmed the discovery, it opened a field camp at Cameron, and hired Navajo prospectors.  The first commercial deposit was discovered in June 1952 by a Navajo prospector working for an AEC contractor; this prompted a more systematic prospecting program, including airborne and ground reconnaissance and exploratory drilling.

9.      Mining on the Navajo Reservation was under the control of the BIA, pursuant to the Indian Mineral Leasing Act of 1938, 52 Stat. 347.  The BIA, in consultation with the AEC and USGS, shepherded and controlled the development of Navajo mining regulations, and thereafter had final say over the terms of mining permits, assignments and mining leases.

10.     A&B was formed at the end of 1953 to conduct exploration and production activities on the Colorado Plateau, and was licensed by the AEC, entitling it to handle and sell uranium ore.  A&B did not enjoy economic success, however, and operated for less than two years, from January 1954 until mid-1955.

11.     Eight mines formerly operated by A&B are at issue:

a.     A&B No. 2 is an approximately 25-acre site located approximately 3 miles southwest of Cameron.  It was first identified by the AEC's airborne radiometric surveying, and the AEC later conducted on-the-ground surveillance

and exploration by bulldozer excavation on the site.  A&B only operated at the site for about two months, from February to March 1954, producing 122 tons of ore.

b.     A&B No. 3 is an approximately 22-acre site located approximately 0.6 miles west of Cameron.  It was first identified by the AEC's airborne radiometric surveying, and the AEC later conducted on-the-ground surveillance at the site.  A&B operated at the site from early 1954 to early 1955, producing 586 tons of ore.

c.     A&B No. 5 is an approximately 5-acre site located approximately 17.5 miles north of Cameron.  It was first identified by the AEC's airborne radiometric surveying, and the AEC later conducted on-the-ground surveillance at the site.  A&B operated at the site in mid-1954, producing 305 tons of ore.

d.     A&B No. 7 is an approximately 4-acre site located approximately 12.5 miles north of Cameron.  It was also identified by the AEC's airborne radiometric surveying.  A&B produced only a single lot of sub-grade ore, 24.5 tons in all, from the mine site.

e.     A&B No. 13 is an approximately 5.5-acre site located approximately 14 miles north of Cameron.  A&B produced only a single lot of sub-grade ore, 51 tons in all, from the mine site.

f.     Earl Huskon No. 1 is an approximately 12-acre site located approximately 17.5 miles north of Cameron.  The mine was originally assigned to J. Vernon Bloomfield, who produced 184 tons of ore from the mine.  The mining permit was subsequently assigned to A&B, who operated the mine from June 1954 to October 1954, producing 186 tons of ore.

g.     Earl Huskon No. 3 is an approximately 12-acre site located approximately 17.5 miles north of Cameron.  The mine was originally assigned to J. Vernon Bloomfield.  The mining permit was subsequently assigned to A&B, who operated the mine from June 1954 to mid-1955, producing 1,835 tons of ore.

h.      Henry Sloan No. 1 is an approximately 14.5-acre site, containing two former mine pits, located approximately 15.5 miles north of Cameron.  The mine was originally assigned to Clyde Hutcheson, but the mining permit was subsequently assigned to A&B, who operated the mine from roughly June 1954 to October 1954, producing 313 tons of ore.  The mine permit was subsequently reassigned to Kenneth Harbaugh and Howard Chinn, who produced 41 tons of ore from the mine site.

12.      Because each of the Sites is located within the Navajo Nation, each Site is (and at all relevant times has been) owned by the United States.

13.      As a result of the disposal of mine waste and sub-grade ore at the Sites, there have been releases or threatened releases of radionuclides.  Radionuclides are "hazardous substances" within the meaning of 42 U.S.C. § 9601(14).

14.      In November 2017, EnPro and the United States Environmental Protection Agency (the "EPA") entered into an Administrative Order on Consent for Interim Removal Action (the "AOC") with respect to the eight Sites.  Pursuant to the AOC, EnPro has been performing certain environmental investigation and analysis activities at the Sites (including Removal Site Evaluations), and is reimbursing EPA for its oversight costs.

## COUNT 1

### (CERCLA Contribution)

15.      EnPro incorporates by reference the allegations of Paragraphs 1 through 14.

16.      The Sites are "facilities" within the meaning of 42 U.S.C. § 9601(9).

17.      The United States is a "person" as defined by CERCLA, 42 U.S.C. § 9601(21), and is subject to CERCLA pursuant to 42 U.S.C. § 9620(a)(1).

18.      The United States owns each of the Sites, within the meaning of 42 U.S.C. § 9607(a)(1).

19.     The United States owned each of the Sites at a time when hazardous substances were disposed at each of the Sites, within the meaning of 42 U.S.C. § 9607(a)(2).

20.     The United States has operated each of the Sites at a time when hazardous substances were disposed at each of the Sites, within the meaning of 42 U.S.C. § 9607(a)(2), by managing or directing operations having to do with the disposal of hazardous waste, or by conducting the affairs of the Sites or exercising direction over operations at the Sites. For example, but without limitation:

    a.     The United States required A&B to leave the mines "timbered in the event of the abandonment thereof" in assignments drafted and signed by the BIA. The term "timbered" was understood to mean that the mine should be left open, with the ore body accessible for future mining. As a result of this requirement, radioactive material was left exposed to the environment.

    b.     The United States intended and directed that sub-grade ore (*i.e.,* ore with too low a uranium concentration under AEC circulars to be amenable for immediate sale) be kept stockpiled at mine sites so that it would be readily accessible if the United States needed it in the future for its nuclear program.

    c.     The United States required mining permittees to operate to the fullest possible extent and to conduct actual mining development, on pain of forfeiture should the BIA determine that there had been a failure in the diligent development or continued operation of the mines.

    d.     The United States conducted bulldozer "rim stripping" exploration at A&B No. 2, and likely also at other of the Sites. The United States further conducted detailed on-the-ground examinations at A&B Nos. 2, 3, 5 and 7.

    e.     The United States controlled A&B's ability to access the Sites and conduct mining operations, by retaining and exercising the authority to approve permit assignments. The United States also controlled the price paid by A&B for its raw material, by setting rental and royalty rates.

f.    The United States set the price at which A&B could sell uranium ore, through the AEC's price schedules and bonus payments.

g.    The United States controlled who could purchase A&B's uranium ore and to whom the ore would be sold.  A&B was legally forbidden to sell ore to any entity other than a licensed purchaser, and the AEC was in fact the only purchaser of ore produced by A&B.

21.    The United States arranged for disposal or treatment of hazardous substances at each of the Sites, within the meaning of CERCLA, 42 U.S.C. § 9607(a)(3):

a.    The United States in effect entered into an arrangement in which it supplied raw materials that contain hazardous substances (*i.e.,* mine lands) to another entity for processing (*i.e.,* mining), during which hazardous substances were generated and disposed, and then reacquired possession of the ensuing product (*i.e.,* the uranium ore extracted from the Sites), a course of dealing which gives rise to liability under 42 U.S.C. § 9607(a)(3).  The United States entered into a contractual relationship with A&B to extract uranium ore, which at that point was owned by the United States while *in situ*.  These were not arm's-length transactions; rather, the AEC as buyer set the prices based upon its own study of mining costs.  Between the removal of ore from the earth and its sale to the AEC, the ore remained under the administration and control of the United States.  As part of these arrangements, the United States knew and indeed required that mine waste and sub-grade ore be left at the Sites.  There is no evidence that the United States made any effort to prevent the release of mine waste; in fact, the United States desired and directed that the mines remain open for potential resumption of mining, and that sub-grade ore be left on the site for potential use.  Mine waste or sub-grade ore left on the property, as a matter of common law, was reunited with the real estate after abandonment, and thus was owned by under the United States.

b.    The United States arranged for disposal or treatment of hazardous substances by entering into contractual arrangements with the Navajo Abandoned

- 7 -

Mines and Land Reclamation Department ("NAMLRD"). Through these transactions, the United States contracted with NAMLRD to treat or dispose the Government-owned mine wastes remaining at A&B No. 2, A&B No. 3, A&B No. 5, Earl Huskon No. 1, Earl Huskon No. 3 and Henry Sloan No. 1.

22. There have been actual or threatened "releases" of hazardous substances at each of the Sites, within the meaning of 42 U.S.C. § 9601(22).

23. These releases or threatened releases of hazardous substances have caused and will continue to cause EnPro to incur response costs within the meaning of 42 U.S.C. § 9601(23)-(25).

24. The response costs that EnPro has incurred and will continue to incur are and will be necessary and consistent with the National Contingency Plan.

25. EnPro has a right of contribution under CERCLA, 42 U.S.C. § 9613(f)(3), against the United States for the United States' equitable share of response costs that EnPro has incurred or may incur in connection with releases or threatened releases of hazardous substances at the Sites.

WHEREFORE, EnPro requests that the Court enter judgment in its favor and against the United States for the United States' equitable share of response costs that EnPro has incurred or may incur up to the time of judgment, consistent with the National Contingency Plan, in connection with releases and threatened releases of hazardous substances at the Sites, including interest, costs and any other relief that the Court deems just and appropriate.

## COUNT 2

### (CERCLA Cost Recovery)

26. EnPro incorporates by reference the allegations of Paragraphs 1 through 25.

27. Alternatively, the United States is liable to EnPro under CERCLA Section 107(a), 42 U.S.C. § 9607(a), for the response costs EnPro has incurred or may incur in connection with releases or threatened releases of hazardous substances at the Sites.

WHEREFORE, EnPro requests that the Court enter judgment in its favor and against the United States for response costs that EnPro has incurred or may incur up to the time of judgment, consistent with the National Contingency Plan, in connection with releases and threatened releases of hazardous substances at the Sites, including interest, costs and any other relief that the Court deems just and appropriate.

## COUNT 3

### (Declaratory Judgment)

28.    EnPro incorporates by reference the allegations of Paragraphs 1 through 27.

29.    EnPro will incur additional necessary response costs, consistent with the National Contingency Plan, in responding to releases or threatened releases of hazardous substances at and/or from the Sites.

30.    The United States is liable for its equitable share of response costs to be incurred in responding to releases or threatened releases of hazardous substances at and/or from the Sites.

31.    Declaratory relief from this Court as to the United States' continuing liability for such equitable share of response costs to be incurred in the future will prevent any future disputes that may arise as to these future response costs.

32.    This Court may render declaratory relief pursuant to 27 U.S.C. § 2201.

## PRAYER FOR RELIEF

WHEREFORE, EnPro requests that the Court enter judgment in its favor and against the United States declaring that the United States is liable for an equitable share of response costs that EnPro has incurred or may incur, consistent with the National Contingency Plan, in connection with releases and threatened releases of hazardous substances at the Sites, including interest, costs and any other relief that the Court deems just and appropriate.

. . .

. . .

. . .

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DATED this 2nd day of September, 2021.

LAW OFFICE OF MICHELLE DE BLASI PLLC

/s/ Michelle De Blasi
Michelle De Blasi
7702 East Doubletree Ranch Road, Suite 300
Scottsdale, Arizona 85258
(602) 510-4469
mdeblasi@mdb-law.com

KAZMAREK MOWREY CLOUD LASETER LLP

Paul K. Stockman (application for
    admission pro hac vice forthcoming)
One PPG Place, Suite 3100
Pittsburgh, Pennsylvania 15222
(404) 333-0752
pstockman@kmcllaw.com

Attorneys for Plaintiff EnPro Holdings, Inc.